ROBERT L. GRAVES, JR., & another[1] *vs.* R.M. PACKER
COMPANY, INC.

No. 97-P-597.

Dukes County. September 14, 1998. - November 18, 1998.

Present: PORADA, GILLERMAN, & BECK, JJ.

*Gasoline Stations. Hazardous Materials. Consumer Protection Act,* Unfair or
deceptive act, Damages, Attorney's fees. *Contract,* Performance and
breach. *Evidence,* Settlement offer, Failure to produce witness. *Damages,*
Consumer protection case, Loss of profits.

In an action for negligence, nuisance, breach of contract, and violations of
G. L. c. 93A and G. L. c. 21E, § 5(*a*), arising from environmental
contamination caused by leaking underground gasoline storage tanks, the
evidence supported the judge's conclusion that the defendant's breach of
its contract to perform repairs and maintenance on the tanks constituted an
unfair act or practice that was wilful and knowing, and the judge properly
awarded the plaintiffs double damages under G. L. c. 93A. [766-769]

The record did not support the claim of the defendant in an environmental
damage case that the judge erroneously excluded evidence of the plaintiffs'
alleged failure to mitigate their damages. [769]

In a civil action, there was no error in the judge's instructions on the plaintiffs'
lost profits, and the amount awarded by the jury was reasonable in the
circumstances. [769-770]

In a civil action, the judge correctly instructed the jury that it could draw an
adverse inference from the defendant's failure to call a witness who was
the person most knowledgeable about the defendant's conduct and who
was present in the court room during the entire trial. [770]

In an environmental damage case, the judge acted within his discretion in giv-
ing control of the clean-up to plaintiffs' counsel rather than to the
defendant. [770]

In an action brought under G. L. c. 93A, there was no abuse of discretion or
error of law in the judge's award of attorney's fees and costs. [771]

In a breach of contract action in which there was no request for the jury to
determine the date of the breach, the judge did not err in awarding prejudg-
ment interest from the date of the commencement of the action. [771]

In a claim under G. L. c. 93A, the judge erred in expressly conditioning the
award of attorney's fees on the abrogation of the contingent fee agreement
between the plaintiffs and their counsel. [771]

---

[1]Shirley H. Graves.

CIVIL ACTION commenced in the Superior Court Department on March 15, 1991.

The case was tried before *Vieri Volterra, J.*

*Wayne S. Henderson* for the plaintiffs.

*Barry A. Bachrach* (*Vincent F. O'Rourke, Jr.*, with him) for the defendant.

GILLERMAN, J. After the plaintiffs discovered underground contamination at their gasoline station on Martha's Vineyard Island (site), they commenced an action against the defendant, the former owner of the station's underground gasoline tanks.

The case went to the jury under G. L. c. 21E, § 5(*a*)(5),[2] and the common law counts of negligence, nuisance, and breach of contract.[3] The court reserved for its determination the claims under G. L. c. 21E, § 4,[4] and G. L. c. 93A, §§ 2 and 11. The jury returned a special verdict in favor of the plaintiffs on the c. 21E claim, assigning 88% of the responsibility to the defendant and 12% to the plaintiff, as permitted by G. L. c. 21E, § 5(*b*). On the common law claims of negligence and nuisance the jury found that the defendant was 88% responsible and the plaintiffs 12% responsible, and they found that the defendant had violated its contract with the plaintiffs to perform all necessary repairs and maintenance on the underground tanks and related equipment. The jury found for the defendant on its counterclaim for unpaid gasoline station products.

The jury assessed the plaintiffs' damages at $300,000 (before reduction for the 12% attributable to the plaintiffs — and without any identification of any one or more counts) and the defendant's damages on its counterclaim at $20,945.

---

[2]Section 5(*a*)(5), as inserted by St. 1983, c. 7, § 5, provides for the liability, without regard to fault, of "any person who . . . caused or is legally responsible for a release . . . of oil or hazardous material from a vessel or site . . . ."

[3]The complaint was in eight counts: count I, violation of G. L. c. 21E, § 5(*a*)(1) (strict liability of owner); count II, violation of c. 21E, § 5(*a*)(5) — see note 2, *supra*; count III, violation of c. 21E, § 4 — see note 4, *infra*; count IV, violation of c. 93A, §§ 2 and 11; count V, negligence; count VI, nuisance; count VII, breach of contract; and count VIII, rescission. Counts I and VIII were subsequently waived.

[4]Section 4 provides, in part (as appearing in St. 1992, c. 133, § 293), that "[a]ny person who undertakes a necessary and appropriate response action regarding the release . . . of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release . . . for the reasonable costs of such response action."

Subsequently, the judge found the defendant liable under G. L. c. 21E, § 4, assessing damages, after apportionment, see *Sanitoy, Inc.* v. *Ilco Unican Corp.*, 413 Mass. 627, 630 (1992), of $3,968.80,[5] together with attorney's fees and costs in the total sum of $241,031.79.

The judge found that the defendant's contamination of the site constituted an unfair and deceptive act or practice and that the defendant's acts were wilful and knowing, with resulting double damages under G. L. c. 93A, § 11.

The judge also ruled, as an alternative holding, that the defendant was in breach of its oral contract with the plaintiffs in which the defendant had promised to maintain the gasoline pumping and storage equipment at the site in good order; that the breach of contract constituted an unfair and deceptive trade practice; and that those practices were wilful and knowing. The judge, accepting the jury's determination of damages, doubled the plaintiffs' contract damages of $300,000, after deducting the amount found due on the defendant's counterclaim of $20,945, leaving a net award of $579,055,[6] and awarded attorney's fees of $202,517.75, costs, including expert witness fees, of $38,514.04, and prejudgment interest on the sum of $279,055 ($300,000 minus $20,945) at the rate of 12% from March 14, 1991, the date of the commencement of the action, to April 23, 1996 (the date of the judge's decision), in the amount of $171,194.51, for a total award of $991,281,30.

The plaintiffs waived their right to c. 21E damages and elected to receive the contract damages. The judge ordered that the total award, less the amount due for fees and costs, be paid directly to the plaintiffs' trustee in bankruptcy and be disbursed solely for the purpose of the remediation action required to clean up the site. The judge also expressly conditioned the award of attorney's fees on the abrogation of the contingent fee agreement between the plaintiffs and their counsel. Both parties appealed from the final judgment, raising numerous issues for decision.

---

[5]This amount represented the charges of the company that originally investigated the site for possible contamination.

[6]The judge ruled that the equitable apportionment of liability under G. L. c. 21E, § 4, and principles of comparative negligence applicable to the negligence and nuisance claims were inapplicable to contract damages. See *Coca-Cola Bottling Co. of Cape Cod* v. *Weston & Simpson Engineers, Inc.*, 45 Mass. App. Ct. 120, 130 (1998).

We consider first the defendant's claim that the judge erred in finding that the defendant violated c. 93A. We summarize the facts found by the judge. The defendant makes no argument that any of the judge's findings of fact is clearly erroneous. See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996).

The plaintiffs, who were totally inexperienced, bought the gasoline station in 1984. The defendant, the sole supplier and wholesaler of gasoline on the island, owned the underground fuel tanks, gasoline pumps, piping, and electrical wiring for the operation of the station and supplied the gasoline, engine oil, and miscellaneous supplies for the operation of the plaintiffs' gasoline station. The defendant possessed substantially greater knowledge, experience, and sophistication than the plaintiffs regarding the proper operation of a gasoline station, including knowledge of the environmental risks and potential liabilities associated with the ownership and operation of underground storage tanks.

From 1984 until March 16, 1988 — when the plaintiffs purchased the tanks, as described below — there was an oral contract between the defendant and the plaintiffs under the terms of which the defendant was to perform all necessary repairs and maintenance on the defendant's underground tanks and related equipment at the site. The plaintiffs looked to the defendant for instructions and assistance in the operation of their station.

That assistance was not forthcoming. The defendant did not provide the plaintiffs with the necessary instructions regarding the essential record-keeping procedures,[7] and that, coupled with the plaintiffs' "inability to keep (or, more likely, their lack of care and lack of interest in keeping) adequate inventory and business records, contributed to the failure to detect in a timely manner the leakage of product from the 1,000-gallon tanks that led to this lawsuit."[8]

The facts surrounding the leakage were these. The underground tanks at the site consisted of one 3,000-gallon tank and two 1,000-gallon tanks. The tanks had been installed in 1950

---

[7]It was possible, by regular "stick readings" of the gasoline inventory, coupled with inventory reconciliation procedures, to determine whether there was leakage from a tank. Stick readings were also the means by which it was known whether a delivery of gasoline from the defendant was needed.

[8]Here and elsewhere in the statement of facts the text within quotation marks is taken from the judge's findings.

and were the oldest tanks owned by the defendant on the island. When the plaintiffs purchased the site, the tanks were approximately thirty-four years old. Under the provisions of 527 Code Mass. Regs. § 9.18(4) (1986) the owner of an existing tank "shall have the tank and its piping tested, at the owner's expense, during the 15th and 20th years following the date of installation and at 2-year intervals thereafter." Under the Oak Bluffs Board of Health Regulations to Control Underground Fuel Storage Systems, adopted May 17, 1983, "All tanks over 400 gallons" shall be pressure tested "15 years after installation and every third year thereafter . . . at the owner's expense." At no time was the defendant in compliance with the State or the local regulations regarding the testing of the defendant's tanks at the site.

However, beginning in June, 1983, and continuing to June, 1986, the defendant, no doubt having been made aware of the environmental risks associated with underground gasoline tanks by reason of the passage of the Oak Bluffs underground tank regulation in May, 1983, contracted with J.D. Hallberg Tank Lining Corporation (Hallberg) for a tank-relining program under which the defendant's underground tanks on the island would be reinforced with an interior fiberglass coating, with a ten-year warranty against leakage. The defendant knew that fiberglassing underground tanks was an appropriate, environmentally sound, protective measure for the defendant's tanks.

Under that arrangement Hallberg, on or before May 1, 1985, installed a fiberglass lining within the 3,000-gallon tank on the site, but the defendant did not arrange for the fiberglass lining of the two 1,000-gallon tanks even though the defendant then knew that the three tanks were of the same age, approximately thirty-five years old. The defendant undertook the fiberglass lining of the 3,000-gallon tank on the site because it knew of its contractual obligation to the plaintiffs to maintain the underground tanks. Nevertheless, the defendant failed to line the two 1,000-gallon tanks because the defendant knew that it was disproportionately costly to line a small tank and that small tanks, which require more frequent fuel deliveries, are more expensive to maintain. While the defendant had no actual knowledge that the 1,000-gallon tanks had been corrupted, the defendant did know, or had reason to know in May, 1985, that the continued use of the thirty-five year old tanks without frequent testing or relining was playing "environmental Russian

roulette" since "their rupture was virtually certain over time." The defendant's decision not to reline the two 1,000-gallon tanks "placed the plaintiffs and their property at unreasonable risk; and . . . in fact it was one or both of those 1,000-gallon tanks that ultimately leaked and caused the contamination at issue in this case."

On March 16, 1988, the defendant sold the underground tanks and related equipment to the plaintiffs for $1.00. The bill of sale of that date recited that the sale was on an "as is" basis, that is, without warranties. The defendant presented the sale of the tanks to the plaintiffs on a "take it or leave it" basis. The defendant sold the tanks to the plaintiffs for the purpose of transferring to the plaintiffs the environmental risks — of which the defendant was aware — associated with underground gasoline tanks.[9]

Shortly before the sale, Jesse B. Law, the defendant's business manager, visited plaintiff Robert Graves at the gasoline station. Law brought with him the proposed bill of sale. According to Law, Graves asked Law whether the tanks were leaking. Law testified, "I said to my knowledge there weren't any leaking tanks.[10] He was going to take it [i.e., the bill of sale] to his lawyer to look at. I said, 'Absolutely, you could take this to the lawyer to look at.' "[11] If Graves chose not to sign the bill of sale, Law told him, the defendant would pull its equipment out,

[9]Under the provisions of G. L. c. 21E, § 5(*a*)(1), the plaintiffs, as present owners, were *strictly* liable to the Commonwealth for the cleanup costs at the site, and they could not shift that liability to the defendant under § 5(*a*)(5), see note 2, *supra*, except by undertaking the financial burden of a lawsuit, with its attendant uncertainties, and then only upon proof that the defendant "caused or is legally responsible for [the] release . . . ." G. L. c. 21E, § 5(*a*)(5). See G. L. c. 21E, § 4.

[10]The judge in his memorandum of decision found that Law at that point "suggested to Graves that it was his responsibility, through counsel or otherwise, to determine the actual condition of the tanks." This finding appears to refer to a portion of Law's deposition testimony that was read into evidence. There, Law testified that following the statement, "To my knowledge they are not leaking," he added, "That's up to you and your attorney who you're going to give the figure to." Even if we assume (contrary to our understanding of Law's deposition testimony) that what Law said at his deposition supports the judge's finding, the finding is of no consequence. See note 12, *infra*.

[11]The judge's findings do not mention this exchange between Loud and Law, which followed the exchange between Law and Robert Graves. There is no reason to doubt the credibility of Law since Law's statements are inculpa-

and the plaintiffs could purchase new equipment from the defendant or put in their own equipment.

Later on in his testimony, Law said he received a telephone call from attorney Loud representing the plaintiffs. Loud said to Law, "Is this a legitimate sale?" Law replied that it was. Loud said, "Does everything look okay?" Law said, "To my knowledge." Loud said, "Okay. Thank you."

The plaintiffs made no investigation of the condition of the tanks, and that failure prevented the plaintiffs from protecting their own interests effectively. The result was that the unsophisticated and careless plaintiffs were "persuaded in a muscular fashion" by a much more powerful and sophisticated seller to assume a potentially "calamitous risk" despite the plaintiffs' direct inquiry about possible leaks in the tanks.

In January, 1989, the plaintiffs arranged for testing of the tanks in connection with a contemplated sale of the property. It was then discovered that the site was contaminated.

In March, 1989, the defendant, apparently having been informed of the report of contamination, contracted for the testing of all three tanks at the site. It was then determined that one of the 1,000-gallon tanks was leaking so badly that a complete test could not be performed, and the other 1,000-gallon tank was probably faulty, because the test proved to be inconclusive. The 3,000-gallon tank was tight and not leaking. The defendant, at its own expense, removed the two 1,000-gallon tanks in April, 1989. "The tanks were severely pitted and corroded. One tank had a large hole in its base, and the tanks leaked liquid on the bed of the removal truck."

The judge found that the leaking from the smaller tanks had begun sometime prior to June, 1987. This finding was drawn from the following testimony. The plaintiffs' expert witness, who conducted tests at the site after the contamination was discovered in January, 1989, concluded that the contamination was from *leaded* gasoline at the site. In June, 1987, the two 1,000-gallon tanks were pumped dry of leaded gasoline and from that date forward the defendant delivered only *unleaded* gasoline to all three tanks.

The defendant asserts that it did not commit any unfair or deceptive act or practice. More particularly, the defendant argues

tory as to the defendant. Thus we set forth in full the testimony of Law regarding his conversations with Graves and then Loud.

that the plaintiffs were represented by counsel, that both parties were business people who had operated businesses for years, that the plaintiffs *chose* not to investigate the condition of the tanks before buying them, that the defendant did not actively conceal information, and that both the jury and the judge found both parties to be at fault. Thus any failure by the defendant to determine or remedy the condition of the tanks before the sale was neither deceptive nor unfair.

The argument misses the mark. The judge found the defendant violated c. 93A by reason of the defendant's breach of its oral contract to perform all necessary repairs and maintenance on the underground tanks and of all the circumstances surrounding that breach. More particularly, the failure of the defendant to line the two 1,000-gallon tanks with fiberglass in 1985 and its failure to comply with local and State law regarding the periodic testing of the tanks combined to create a substantial risk of damage to the real estate owned by the plaintiffs and constituted a breach of the defendant's duty to maintain the tanks. The defendant was aware of the environmental risks created by its failure to line the two 1,000-gallon tanks. In March, 1988, the defendant persuaded the plaintiffs, through the false representations of Law to Graves and his attorney,[12] that the tanks were not leaking when in fact they were leaking. The effect of the sale was to impose upon the plaintiffs, as the new owners replacing the defendant, strict liability under G. L. c. 21E, § 5(a)(1), for contamination at the site. See note 9, *supra.* The plaintiffs

---

[12]A false statement of fact, made of the party's own knowledge and susceptible of actual knowledge, will support an action of deceit without further proof of an actual intent to deceive. *Chatham Furnace Co.* v. *Moffatt,* 147 Mass. 403, 404 (1888). See *Powell* v. *Rasmussen,* 355 Mass. 117, 119 (1969) ("The principle is well settled, that if a person make a representation of a fact, as of his own knowledge, in relation to a subject matter susceptible of knowledge, and such representation is not true; if the party to whom it is made relies and acts upon it, as true, and sustains damage by it, it is a fraud and deceit, for which the party making it is responsible"); *Henderson* v. *D'Annolfo,* 15 Mass. App. Ct. 413, 423 (1983) ("[T]he law places no obligation on a purchaser to make an independent investigation of statements made as of the seller's own knowledge"). This principle is now included within the scope of G. L. c. 93A, § 2(a). *Nota Constr. Corp.* v. *Keyes Assocs., Inc., ante* 15, 21 (1998) (claim for deceit may constitute c. 93A violation). See *Glickman* v. *Brown,* 21 Mass. App. Ct. 229, 235 (1985) ("We hold . . . that a negligent misrepresentation of fact the truth of which is reasonably capable of ascertainment is an unfair and deceptive act or practice within the meaning of c. 93A, § 2[a]").

did not learn of the contamination until January, 1989, and it was not until April, 1989, that the defendant, at its own expense, removed the contaminating tanks.

Although the plaintiffs, through their carelessness, were partially (12%) responsible for the contamination at the site, that carelessness did not absolve the defendant from its contractual duty to maintain the two 1,000-gallon tanks nor did it absolve the defendant of the consequences of Law's false statements to Graves. The defendant knew or should have known that the failure properly to maintain the two 1,000-gallon tanks in 1985 created substantial environmental risks — "environmental Russian roulette," as the Superior Court judge called it — unknown to the plaintiffs.

This was no "mere breach of a contract, without more . . . ." *Madan* v. *Royal Indem. Co.*, 26 Mass. App. Ct. 756, 762 (1989). The defendant's conduct in this case was in deliberate " 'disregard of known contractual arrangements' and intended to secure benefits for the breaching party and [thereby] constitutes an unfair act or practice for c. 93A purposes." *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 474 (1991).

There remains the question whether the judge, in assessing double damages, was correct in concluding that the acts of the defendant were wilful or knowing. The judge's ruling was based on his findings that the defendant was aware of the risks of leakage in the 1,000-gallon tanks and of the liabilities associated with the contamination of the soil; that the defendant attempted to avoid primary liability as owner of the tanks by "selling" the three tanks to the plaintiffs for $1.00 on March 16, 1988; that to induce the plaintiffs to accept the "sale," the defendant represented to the plaintiffs that, to its knowledge, the tanks were not leaking when in fact the tanks were then leaking; that the defendant made no attempt to determine whether the tanks were leaking in spite of the fact that the defendant was obliged, by a local ordinance and by State regulation, to inspect the tanks for leakage with regularity; and that the defendant, solely to save expenses, failed to fiberglass the two 1,000-gallon tanks while lining the 3,000-gallon tank, thereby creating substantial environmental risks to the plaintiffs as operators of the gasoline station. These deceitful and intentional acts and omissions created an unreasonable risk of liability to the plaintiffs and were undertaken in the context of an

unsophisticated and inexperienced plaintiff who, by trade, was a machinist. The defendant, on the other hand, was owned and managed by experienced, sophisticated businessmen and had considerable economic power. We conclude that these facts are sufficient to constitute a wilful and knowing violation of c. 93A and therefore justify the award of double the plaintiffs' actual damages.

We dispose of the remaining arguments of the defendant in less detail.

(i) The defendant argues that it is entitled to a new trial because the judge erroneously excluded relevant evidence of the defendant's offer to "remediate [the defendant's property] fully" in order to establish the plaintiffs' failure to mitigate their damages. We have reviewed the record and, while there was an abundance of colloquy on the subject, we do not find a "specific offer of what [the defendant] expect[ed] to prove by the answer of the witness." See Mass.R.Civ.P. 43(c), 365 Mass. 806 (1974). The issue is deprived of a specific context. For example, the plaintiffs' brief states that the defendant's offer was in fact an unsatisfactory offer in settlement because it did not include multiple damages under c. 93A, litigation costs, and attorney's fees. Moreover, the plaintiffs state that the remediation offer was to undertake the remediation "to DEP's [Department of Environmental Protection's] satisfaction," which was short of making the plaintiffs whole. It appears that the entire area of remediation by the defendant was intermingled with settlement discussion and in sharp dispute and that the defendant failed to put the issue in focus for the trial by an appropriate offer of proof. Alternatively, the defendant could have, but did not, make an offer of judgment. See Mass.R.Civ.P. 68, 365 Mass. 835 (1974).

(ii) The defendant argues that it is entitled to a new trial because of the judge's error in permitting the plaintiffs to argue lost profits in the absence of adequate evidence and in instructing the jury regarding lost profits. The plaintiffs' expert testified to clean-up costs of between $260,000 and $275,000. The jury and the judge awarded the plaintiffs $300,000.

Without doubt, there must be a satisfactory evidentiary foundation to support a claim of lost profits. See *Augat, Inc.* v. *Aegis, Inc.*, 417 Mass. 484, 488 & n.4 (1994); *Linkage Corp.* v. *Trustees of Boston Univ.*, 425 Mass. 1, 28 n.38, cert. denied, 522 U.S. 1015 (1997) (the evidence must afford a "basis for a

reasonable judgment"). Here, however, there was no error in the judge's instructions regarding lost profits. The plaintiffs' financial statements covered the years 1984 through 1987; the plaintiffs claimed lost profits for the ten-year period beginning in 1985 when the defendant failed to fiberglass the two 1,000-gallon tanks and thereby failed to obtain a ten-year warranty on the tanks. The plaintiffs went out of business when the tanks were removed in 1989. There was testimony that the results of operation for the period not covered by the financial statements were substantially the same as during the covered periods. The financial statements break out the revenue, cost of sales, and operating expenses associated with the sale of gasoline at the gas station. There was expert testimony that the clean-up costs were estimated to be between $260,000 and $275,000. Thus the amount of the award fairly attributable to lost profits ($25,000 to $40,000) for the ten-year period following the removal of the tanks is well within the range of a reasonable and rational result. "[M]athematical accuracy of proof is not required." *Rombola* v. *Cosindas*, 351 Mass. 382, 385 (1966).

(iii) The judge was not in error in instructing the jury that it could draw an adverse inference from the failure of the defendant to call Ralph Packer as a witness. The appropriateness of such an instruction depends upon the posture of the case and the state of the evidence. *Commonwealth* v. *Johnson*, 39 Mass. App. Ct. 410, 410 (1995). The case against the defendant was strong. Based on the evidence summarized above, the defendant would have been expected to call Packer, the defendant's president and controlling stockholder and, presumably, the person most knowledgeable of any facts likely to explain or justify the defendant's conduct. He was in the court room during the entire trial. The defendant's failure to call him as a witness was noteworthy and justified the judge's instruction. See *Grady* v. *Collins Transp. Co.*, 341 Mass. 502, 509 (1960); *Commonwealth* v. *Groce*, 25 Mass. App. Ct. 327, 329-330 (1988).

(iv) The defendant argues that the judge erred in giving plaintiffs' counsel control of the clean-up. There was no error. The defendant was given the right to inspect and monitor the property and review the records. Most importantly, the court retained jurisdiction, providing the defendant with a prompt opportunity to be heard in the event of perceived misdeeds. Given the history of the defendant's conduct in this case, the judge acted well within his discretion.

(v) The defendant argues that the plaintiffs may not recover attorney's fees and costs under G. L. c. 21E, citing *Martignetti v. Haigh-Farr, Inc.*, 425 Mass. 294, 321, 323-324 (1997). We need not consider that issue, because, the defendant having violated c. 93A, the plaintiffs are entitled to attorney's fees and costs under the provisions of c. 93A, § 11. The judge's findings of the plaintiffs' reasonable attorney's fees, expert witness fees, costs, and other expenses of litigation reveal no abuse of discretion or error of law.

We turn next to the plaintiffs' appeal.

(i) The plaintiffs argue that the judge erred in failing to award prejudgment interest on the breach of the oral contract from the date of breach. There was no error. The special questions to the jury neglected to include a question as to the date of the breach, if a breach were found. The plaintiffs did not object to the omission, and they may not now complain that the date of demand was not established by the jury. See *Deerskin Trading Post, Inc.* v. *Spencer Press, Inc.*, 398 Mass. 118, 125-126 (1986). Rule 49(a) of the Rules of Civil Procedure, 365 Mass. 812 (1974), does not require a different result.

(ii) The final judgment entered by the judge provided that the award of attorney's fees "shall preclude the collection of any fee from the plaintiffs themselves." The judge was in error. The award of fees under c. 93A belongs to the prevailing party, not the attorney, see G. L. c. 93A, § 9(4); *Smith* v. *Consalvo*, 37 Mass. App. Ct. 192, 195 (1994) (claimant under 42 U.S.C. § 1988 [1988] and under agreement not the same person), and the c. 93A award does not impose a ceiling on what the client is obliged to pay his attorney; that obligation is defined in the contingent fee agreement between the client and the attorney, subject to the client's right to receive the c. 93A award. The subject is fully explored in *Smith* v. *Consalvo, supra,* and what was said there need not be repeated here.

The final judgment is modified by the deletion of paragraph 6.a. precluding the collection of the contingent fee and, as so modified, is affirmed.

*So ordered.*