# United States Court of Appeals
## For the First Circuit

No. 08-1911

VASCULAR SOLUTIONS, INC.,

Plaintiff, Appellee,

v.

MARINE POLYMER TECHNOLOGIES, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel,  U.S. District Judge]

Before

Boudin, Stahl and Lipez,

Circuit Judges.

Peter D. Vogl with whom Todd R. Geremia and Jones Day were on brief for appellant.
J. Thomas Vitt with whom David Y. Trevor, Clifford S. Anderson and Dorsey & Whitney LLP were on brief for appellee.

December 23, 2009

**Per Curiam**.  Vascular Solutions, Inc. ("VSI") and Marine Polymer Technologies, Inc. ("MPT") sell differently designed medical patches that are designed to stop bleeding after specific medical procedures, including catheterizations.  Each accused the other of spreading false statements about its particular product.  Awarding nothing to MPT, the jury found VSI was entitled to damages of $4.5 million in lost profits on its product disparagement claim, and it is from that judgment that MPT now appeals.

The background facts can be briefly summarized, recounted in light of the jury's verdict.  Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 40 (1st Cir. 2009).  Both MPT's "SyvekPatch" and VSI's "D-Stat Dry" are commonly used after cardiac catheterization procedures, which are performed to examine blood vessels in the heart.  Applied to the skin surface like a bandage, the patches stem blood flow at the site of a physician's puncture of a patient's major artery in the upper thigh, which is made to start the catheterization.  The patches are intended to operate more quickly and less invasively than older methods for halting post-catheterization bleeding.

VSI's D-Stat Dry patch uses bovine thrombin--a compound derived from cow's blood--as its active ingredient.  The ingredient creates the risk, which increases with multiple exposures of the patient to the ingredient, of triggering antibodies and therefore possible complications (which may include excessive bleeding or

-2-

blood clots). An FDA-approved warning appears in D-Stat Dry's written instructions for use. However, the ingredient seals wounds rapidly and, by the time of trial, VSI had sold more than one million D-Stat Dry patches, without reports of severe bleeding or blood clots resulting from proper use of the device.

VSI began selling D-Stat Dry in September 2003: it sold 19,000 devices during the remainder of 2003 and 164,000 in 2004. In early 2005, Howard Root, VSI's chief executive officer ("CEO"), and VSI's chief financial officer developed a three-year sales forecast, projecting that sales of VSI's patch would grow from an estimated 282,000 in 2005 (one-third of the market) to 467,000 in 2007 (one-half of the market). VSI's sales leveled off, however, and the company achieved about a 37 percent market share by 2007.

Several years earlier, MPT had won FDA approval for its own clotting bandage, now named the SyvekPatch, which uses a thin fiber produced by the diatom, a single-celled marine organism. MPT's sales of the patch grew rapidly through 2002, but growth declined in subsequent years. MPT concluded that its sales had been affected by false information about its patch disseminated by VSI starting in 2003, and it counter-attacked by providing to its own sales agents negative information about VSI's product.

After gentler critiques of D-Stat Dry failed to stop the decline in MPT's sales, MPT's marketing director, Peter Stevens, prepared an informational bulletin dated March 2, 2004 (the

-3-

"marketing bulletin"), drawing on material in a scientific paper published in 2001 (the "Ortel article").  The bulletin, in an introductory large-type message, asserted, "YOU CAN'T USE D-STAT AND 'DO NO HARM'"--a reference to the Hippocratic Oath--and contained five statements later successfully challenged by VSI as product disparagement (the first two being the two sentences contained in the substantive paragraph that follows):

> The message to communicate to all health care providers is:

> After one application of bovine thrombin there is a 95% patient risk of developing antibodies to it, and a 51% risk of developing antibodies to human factor V. After just two exposures to topical thrombin there is a 36% risk of developing abnormal coagulation results leading to events such as excessive post-op bleeding, gastrointestinal bleeding, and hemorrhagic stroke.

The other statements challenged by VSI were the first three of five numbered points that appeared farther down on the first page of the bulletin:

> 1. Bovine thrombin [e.g. D-Stat] is extremely immunogenic; after just one exposure to Bovine thrombin 95% of patients raise antibodies to it.

> 2. Bovine thrombin carries a very high risk of causing serious permanent bleeding disorders in 51% of patients. Excessive post-op bleeding, gastrointestinal bleeding, and hemorrhagic stroke occur--after only 2 exposures to bovine thrombin.

> 3. After a second exposure to thrombin, 51% of patients develop antibodies to HUMAN

-4-

Factor V and 36% have abnormal coagulation results--the effect is irreversible for life.

The bulletin was sent electronically and presented in training sessions to MPT's sales force for its message to be communicated to customers without giving them the bulletin itself. A VSI sales agent discovered the document while visiting a customer, and Root then wrote to MPT's president asking for correction of false and misleading statements. Root asserted, for example, that the Ortel article rested on a study using an "extremely impure and since-discontinued" form of bovine thrombin rather than the purer D-Stat Dry version, and said that certain of the data concerned patients who had undergone "massively-invasive" surgeries rather than minimally invasive catheterization procedures.

MPT did not respond and VSI filed the present action in federal district court in Minnesota in May 2005; the case was later transferred to the District of Massachusetts. The only one of VSI's claims to survive the trial was its product disparagement claim (we need not discuss the others or MPT's counterclaims which also failed). Following a 10-day trial, the jury awarded VSI $4.5 million, a little more than half of the $8.4 million in damages VSI had sought. The jury made specific findings that these five statements were false and, in light of the jury instructions, had to find that MPT made them with actual malice. The district court enjoined MPT's further use of the false statements.

On appeal, MPT challenges the jury's verdict for VSI. MPT contends that VSI failed to prove malice by clear and convincing evidence and, alternatively, that VSI was not entitled to the judgment because the evidence did not show specific lost sales attributable to MPT's conduct and so was insufficient evidence of special damages as a matter of law. The parties assume in their briefs that Massachusetts law governs VSI's product disparagement claim; we therefore do likewise. See Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 3 (1st Cir. 2009).

Starting with malice, we note that neither the Supreme Court nor this one has decided whether the First Amendment requires in product disparagement actions the actual malice standard of New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964); at least one circuit has rejected that proposition for a similar cause of action, see Procter & Gamble Co. v. Amway Corp., 242 F.3d 539, 552 & n.26 (5th Cir. 2001) (Lanham Act commercial disparagement), cert. denied, 534 U.S. 945 (2001). Whether Massachusetts courts might independently read such a requirement into its common law cause of action is also unclear.[1]

---

[1]Massachusetts courts have not decided whether malice is an element of the tort, e.g., Dulgarian v. Stone, 652 N.E.2d 603, 609 & n.9 (Mass. 1995), but might require it if faced with the issue again, see id. at 609 (quoting the Restatement (Second) of Torts § 623A (1977), which provides the actual malice standard for injurious falsehood/product disparagement actions).

The parties tried the case before us on the premise that actual malice is required, and we accept that view solely for the purposes of this case. Bose Corp. v. Consumers Union of the U.S., Inc., 692 F.2d 189, 194 (1st Cir. 1982) (accepting that the actual malice standard applied in a product disparagement case where the parties did not dispute it), aff'd, 466 U.S. 485 (1984); Suzuki Motor Corp. v. Consumers Union of U.S., Inc., 330 F.3d 1110, 1133-34 & n.11 (9th Cir.) (same), cert. denied, 540 U.S. 983 (2003). Such a requirement might seem far afield from the concerns animating the New York Times case--itself an innovation not known to the common law--but this is an issue for another case.

To prove actual malice, VSI had to provide clear and convincing evidence that MPT's marketing director made the challenged statements "with knowledge that [they were] false or with reckless disregard of whether [they were] false or not." New York Times, 376 U.S. at 279-80, 287; Bose, 692 F.2d at 195. Thus Stevens must have had a "high degree of awareness of their probable falsity" to meet the actual malice standard, Garrison v. Louisiana, 379 U.S. 64, 74 (1964); for recklessness the evidence must permit the conclusion that he "in fact entertained serious doubts as to the truth of his publication," St. Amant v. Thompson, 390 U.S. 727, 731 (1968).

Subjecting the jury's malice determination to our own independent review, as we must, see Bose, 466 U.S. at 510-11, we

-7-

find that the evidence supports the jury's finding that the statements were false and provides ample proof of malice for at least the principal challenged statements; and, for reasons that will appear, this is an ample basis for satisfying the malice requirement, assuming it exists.

The most inflammatory of the five statements, and the most glaringly unsupported, are the two that associated D-Stat Dry with specific and serious outcomes in percentages that would be remarkable for a relatively straightforward medical task--to stop bleeding at a modest-size doctor-created incision. If believed, they would certainly deter use of a product for a result that could be achieved by other, long-used means or by newer products like that of MPT. Both statements associate VSI's product "after just" or "only" two exposures with "excessive post-op bleeding, gastrointestinal bleeding, and hemorrhagic stroke."

Phrasing the statistics differently, the two statements read:

> After just two exposures to topical thrombin there is a 36% risk of developing abnormal coagulation results leading to events such as excessive post-op bleeding, gastrointestinal bleeding, and hemorrhagic stroke.

> * * *

> 2. Bovine thrombin carries a very high risk of causing serious permanent bleeding disorders in 51% of patients. Excessive post-op bleeding, gastrointestinal bleeding, and hemorrhagic stroke occur--after only 2 exposures to bovine thrombin.

-8-

The Ortel article does refer to the increased risk of an "adverse event" upon second exposure to bovine thrombin, and it contains language and a table listing some of the possible adverse events, including "postoperative bleeding," "gastrointestinal bleeding," and "hemorrhagic complications." The article, however, does not directly link a second exposure to bovine thrombin to the complications cited by MPT and certainly does not quantify any such risk in the percentages stated by MPT. If anything, the Ortel article disclaims proof of such an association.[2]

Language in the article that comes closest to the quoted statements was specific to exposure to bovine thrombin <u>during surgery</u> where much larger dosages are employed. Nor could MPT's prediction of "permanent" bleeding disorders be supported by the article; as Stevens himself suggested, the time period of the study was too short to make that determination--in fact, the study followed the patients for only four to eight weeks. Stevens admitted that the Ortel article "doesn't support even one person losing the ability to clot their blood permanently" or even one patient having a serious and permanent bleeding disorder.

---

[2]The Ortel article states that "[a]dverse clinical complications in the postoperative period <u>did not appear to be associated with the development of elevated antibody levels to bovine or human coagulation factors</u>" (emphasis added). One of the experts at trial, Dr. Mann, explained that this passage "means . . . that [the article's authors] could not identify an association between the generation of an antibody and . . . any clinical event."

In considering malice, the jury was also entitled to weigh MPT's motive. Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 668 (1989); Bose, 692 F.2d at 196. MPT's own sales began to fall after D-Stat Dry was introduced, and chronology shows that MPT developed the bulletin after MPT's early and more temperate criticisms of D-Stat Dry seemingly went unheeded by customers. The scare phrasing of the document and the indication that it was to be used to persuade customers, but not to be left with them, could also be considered by the jury--the latter as reflecting a concern that the bulletin could otherwise be discovered by VSI and challenged as false.

The other three statements are a closer call as to malice. Two of them charge that bovine thrombin causes 95 percent of patients to raise antibodies to it after one exposure; two that it causes 51 percent of patients to raise antibodies to human factor V after at least one exposure; and one that a second exposure to bovine thrombin causes 36 percent of patients to have abnormal coagulation results--"the effect is irreversible for life."[3] The Ortel article uses these exact percentages with

_____

[3]The claim that 36 percent of patients have abnormal coagulation results that are "irreversible for life" is significantly different, and better supported by the Ortel article in combination with Stevens' probable understanding of immune memory, than the stronger statement that linked two bovine thrombin exposures to a substantial (impliedly 36% or higher) risk of particular bleeding disorders, which we have decided was unsupported by the Ortel article and made with actual malice.

respect to the claimed risks of antibodies and abnormal coagulation results in speaking generically about bovine thrombin; and while at trial VSI offered expert medical data suggesting much lower antibody production in response to exposure to its form of bovine thrombin, Stevens could have been unaware of that other data and could have made these three challenged statements without actual malice.

But this possibility makes no difference to the damages verdict. The most inflammatory statements were recklessly false-- or so the jury permissibly found--and it is a fair inference that the damages verdict rested primarily on them: their assertion of high percentage risks of lurid complications would have alarmed any doctor considering D-Stat Dry. As for injunctive relief directed at future repetition of the statements, MPT's request for relief from the injunction rests on the premise that no violation was proved as to any of them and does not seriously attempt to show that any of the statements is true but only that they were all made without malice--a position the jury permissibly rejected.

The hard questions on this appeal concern damages. MPT's main claim is that VSI failed to provide a particular form of proof of "special damages"--namely, lost sales to specific named customers as opposed to expert evidence and general data from which aggregate loss of sales might be inferred. In most fields of tort law, a plaintiff having established wrongdoing may prove damages in

-11-

any reasonable way, e.g., Graves v. R.M. Packer Co., 702 N.E.2d 21, 28 (Mass. App. Ct. 1998) (stating that the damages evidence need only "afford a 'basis for a reasonable judgment'" (quoting Linkage Corp. v. Trs. of Boston Univ., 679 N.E.2d 191, 210 n.38 (Mass. 1997))); but for peculiar reasons, probably more historical than prudential, a number of jurisdictions following the Restatement (Second) of Torts require in product disparagement cases proof of specific lost sales to identifiable customers unless it is infeasible to provide such proof.[4]

Massachusetts has no authoritative case cited to us that is directly on point, but it has followed the Restatement on other aspects of product disparagement, e.g., Dulgarian, 652 N.E.2d at 609 (citing a different Restatement section on liability for injurious falsehood, which includes product disparagement), and we will assume arguendo that it would likely do so here. This is merely an assumption:

---

[4]The phrase "special damages"--common in defamation law--means nothing more than actual damages (as opposed to damages--e.g., to reputation--that are presumed for certain libelous statements), Peckham v. Holman, 28 Mass. (1 Pick.) 484, 486 (1831); the Restatement, followed in a number of jurisdictions, goes even further--in certain but not all cases--by demanding proof of specific lost sales. Restatement (Second) of Torts § 633 (1977) (special damages "may be established by (a) proof of the conduct of specific persons, or (b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify"); e.g., Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 75 F. Supp. 2d 235, 240-41 (S.D.N.Y. 1999) (rejecting suit because the plaintiff did not identify specific lost customers when it was possible to do so), aff'd, 314 F.3d 48 (2d Cir. 2002).

> Under the impact of more detailed statistical and expert proof, courts have shown increasing willingness in recent years to award a loss of profit in other kinds of cases, and it may be expected that this will carry over into the injurious falsehood [which includes product disparagement] cases where the loss is shown with reasonable certainty.

Prosser and Keeton on Torts § 128, at 972 (5th ed. 1984) (footnote omitted).

Furthermore, the Restatement proof requirement applies only where it is feasible to identify specific lost sales. But our case is not one of falsehoods about a product sold to a limited list of named regular purchasers. MPT had a number of representatives who dealt with hundreds of "cath labs" at hospitals. So one could postulate that it would hardly be easy to determine in most cases to whom MPT sales agents spoke,[5] who or what group or committee made purchasing decisions, and the precise connection (if any) between the dissemination of falsehood and the absence of a set of purchases of VSI's product.

Had MPT asserted this special proof rule in the district court, we would presumably have some developed information on the relevant facts and a ruling from the district judge as to whether the facts added up to the "wide dissemination" exception, under

---

[5]However, because MPT had only about 25 sales representatives in addition to a few executives who made sales calls, it should have been feasible to identify for at least some of those agents the customers and potential customers to whom they spoke during the relevant time period and so to follow the trail to at least some lost sales.

-13-

which even the Restatement does not require proof of individual lost sales. Restatement, supra, § 633 cmt. h; see also Sack on Defamation § 13.1.4.6 (3d ed. 2007) (stating that generalized evidence of lost profits is "probably enough" to prove special damages, "particularly where it is impractical to establish specific lost sales"). But MPT made no such objection in the district court prior to or during trial, so the need for an instruction on proof of special damages was never established.

VSI has failed to point out that the special damages proof rule was not properly invoked in the district court. But because the parties tried the case below on the assumption that ordinary rules of damages proof applied, MPT's objection is forfeit, subject to plain error, Davila v. Corporacion de Puerto Rico para la Difusion Publica, 498 F.3d 9, 14-15 (1st Cir. 2007); the judicial system has an ample interest in not wasting resources with unnecessary retrials. See Harden v. United States, 688 F.2d 1025, 1032 n.7 (5th Cir. Unit B 1982). Plain error is rarely found in civil cases in this circuit, Nat'l Ass'n of Chain Drug Stores v. New England Carpenters Health Benefits Fund, 582 F.3d 30, 43 (1st Cir. 2009); and here, given the difficulty of proving specific lost sales, it is far from plain that any error occurred.

MPT spends much less time arguing that damages were not established even under ordinary standards, but this argument does require attention. For reasons already noted it might be

-14-

impossible to identify most, let alone all, of the various individuals exposed to the false statements, or to identify many of those involved in purchasing the products, let alone to connect specific statements to specific failures to buy; but this does not mean that <u>no</u> such instances could be located--assuming that the falsehoods had effect.  While VSI initially indicated to the district court that it would seek to present at least some specific lost sales, in the end it identified no such instance.  No legal rule requires such exemplars but they could well have strengthened VSI's case.

Instead, VSI's central evidence was its three-year projection estimating expected growth of sales for its new and initially successful product. Admittedly, this was made before MPT's false statements were disseminated and before litigation in this case commenced; and Root testified that the projections were well-founded on market research including third-party reports, public company reports, and available information on competitive developments, pricing, and VSI's own sales experience.  He also said that he knew of no reason that could explain the unrealized sales growth other than the false statements disseminated by MPT.

VSI also provided an expert damages witness, Donald Nicholson, a certified public accountant, who analyzed VSI's estimate and concluded that based upon the projected sales figures, it had fallen short by $13.6 million in sales--$8.4 million in

profits.  It was this loss in profits that VSI attributed to MPT's defamatory statements.  Nicholson said that his calculations accounted for new entrants during the relevant period but not for other true information in the market place about bovine thrombin risks.  MPT introduced <u>no</u> evidence of its own--expert or otherwise--to refute VSI's damages showing.

Yet even as Nicholson stated that Root's projection was reasonable, he reiterated that they were "really Mr. Root's estimate[s]" and confessed that they would be too high if one were to accept a third-party report's estimates of the market size.  VSI also provided lower estimates of sales growth to its investors, although there are reasons why a company's executives might provide more conservative estimates to shareholders.  It is not surprising that the jury did not entirely accept the projection, awarding VSI only about half of what it sought for conduct that the jury itself deemed malicious.

Massachusetts cases have relied upon expert testimony by outside experts or company executives to uphold a jury's determination that a defendant's conduct caused a loss of profits.[6] This is perhaps an easier inference where existing sales <u>fall</u> after the defendant's wrongdoing; VSI's damages require the further step

---

[6]<u>See, e.g.</u>, <u>Herbert A. Sullivan, Inc.</u> v. <u>Utica Mut. Ins. Co.</u>, 788 N.E.2d 522, 544 (Mass. 2003); <u>Brewster Wallcovering Co.</u> v. <u>Blue Mountain Wallcoverings, Inc.</u>, 864 N.E.2d 518, 529-30, 541-43 (Mass. App. Ct. 2007); <u>Ricky Smith Pontiac, Inc.</u> v. <u>Subaru of New England, Inc.</u>, 440 N.E.2d 29, 46-47 (Mass. App. Ct. 1982).

of giving credence to Root's projected growth in sales over and above the inference that the defendant's conduct caused harm. Massachusetts courts have not foreclosed the use of growth estimates but are prepared to reject individual calculations as unsupported. See Augat, Inc. v. Aegis, Inc., 631 N.E.2d 995, 998 (Mass. 1994) (rejecting a specific high growth rate, admittedly calculated after the litigation, as "implausib[le]," but not rejecting the method).

In this case, the evidence surely permitted the jury to infer that MPT's malicious false statements--inflammatory and widely deployed--had a negative causal effect on VSI's otherwise climbing sales and profits. As to the amount of damages, lost profits inherently involve estimation and courts are often inclined to think that the wrongdoer created the problem and must accept the jury's judgment within a range of uncertainty. Herbert A. Sullivan, Inc., 788 N.E.2d at 543 ; Lowrie v. Castle, 113 N.E. 206, 210 (Mass. 1916); Ricky Smith Pontiac, 440 N.E.2d at 48. The question is whether the amount in this case went beyond reasonable limits.

On this, the panel is divided even as between the two judges who believe liability has been established and vote to uphold an award of damages in favor of VSI. One member of the panel, recognizing that causation must be inferred and that any amount of damages is an estimate, thinks that the jury verdict is

-17-

still within reasonable bounds; the other, that it is excessive-- given the lack of proof of any specific lost sales and that its support is almost entirely a projection by the plaintiff as to what it hoped to earn--and that a <u>sua sponte</u> remittitur is essential.

The verdict most favorable to the judgment that two judges will support is an <u>affirmance subject to a remittitur</u> limiting VSI's recovery to $2.7 million apart from interest, costs and other incidentals.  <u>See</u> <u>Alvira</u> v. <u>F.W. Woolworth Co.</u>, No. 92- 2255, 1993 U.S. App. LEXIS 7145, at *8-11 (1st Cir. Apr. 7, 1993); <u>Catullo</u> v. <u>Metzner</u>, 834 F.2d 1075, 1083 (1st Cir. 1987); <u>Kolb</u> v. <u>Goldring, Inc.</u>, 694 F.2d 869, 874-75 (1st Cir. 1982).  On remand, which we now order, VSI can accept this figure or insist upon a new trial as to damages.  In all remaining respects the judgment is <u>affirmed</u>.  Each side will bear its own costs.

<u>It is so ordered</u>.

**--Concurring and Dissenting Opinion Follows--**

**LIPEZ**, **Circuit Judge**, concurring in part and dissenting in part. I agree with the majority that the evidence permitted the jury to find that MPT made the two most inflammatory statements about the dangers of the D-Stat Dry with actual malice. I disagree, however, that the jury's damages verdict is sustainable, even with the proposed reduction, on the record before us. The majority treads lightly over VSI's failure to show the loss of even one specific customer as a result of MPT's statements. In my view, the adequacy of VSI's proof of damages depends on whether it is entitled to the widespread dissemination exception to the special damages rule for product disparagement claims. If not, its failure to show any specific lost sales would be fatal to the product disparagement cause of action, and damages would be unavailable as a matter of law. I would therefore remand the case to the district court for consideration of the exception and, hence, respectfully dissent from the damages portion of the majority's decision.

**I.**

Product disparagement is a species of business tort that is often grouped with similar claims, such as trade libel or "slander of title," as a form of "injurious falsehood." Rodney A. Smolla, 2 Law of Defamation § 11:34 (2d ed. 2009). It is well established that special damages are "an essential part of [a] cause of action for injurious falsehood," W. Page Keeton et al., Prosser & Keeton on Torts § 128, at 970-71 (5th ed. 1984), and

"must always be proved," Restatement (Second) of Torts § 623A cmt. g.; Dooling v. Budget Pub. Co., 10 N.E. 809, 811 (Mass. 1887); Restatement (Second) of Torts § 651 cmt. b; Arlen W. Langvardt, Section 43(A), Commercial Falsehood, and the First Amendment: A Proposed Framework, 78 Minn. L. Rev. 309, 337 (1993).

To prove special damages in a product disparagement case, a plaintiff usually must show a loss of particular sales to specific customers. Prosser & Keeton on Torts § 128, at 972 (stating that the plaintiff ordinarily "must identify the particular purchasers who have refrained from dealing with him, and specify the transactions of which he claims to have been deprived"); Robert D. Sack, 2 Sack on Defamation[:] Libel, Slander, and Related Problems § 13.1.4.6, at 13-22 (3d ed. 2009); Restatement (Second) of Torts § 633 cmt. c; see also Amerinet, Inc. v. Xerox, 972 F.2d 1483, 1504 (8th Cir. 1992) (dismissing disparagement claims on motion for summary judgment where "[t]he record contains no evidence of specific lost sales or of losses directly attributable to particular false statements by [the defendant]"). The strict requirement to prove lost sales ensures that the actual pecuniary harm the tort is designed to remedy did, in fact, occur. See Arlen W. Langvardt, Free Speech Versus Economic Harm: Accommodating Defamation, Commercial Speech, and Unfair Competition Considerations in the Law of Injurious Falsehood, 62 Temp. L. Rev. 903, 918 (1989) (observing that the

strict special damages requirement "appears to be based on a sensible notion: the economic interests with which injurious falsehood law is concerned necessarily carry a pecuniary value").

There is an exception to this specific lost-sales requirement where the false statement has been widely disseminated and it would be impossible to establish that the challenged statements caused specific lost sales. The Restatement explains the exception as follows:

> Widely disseminated injurious falsehood may . . . cause serious and genuine pecuniary loss by affecting the conduct of a number of persons whom the plaintiff is unable to identify and so depriving him of a market that he would otherwise have found. When this can be shown with reasonable certainty, the rule requiring the identification of specific purchasers is relaxed and recovery is permitted for the loss of the market.

Restatement (Second) of Torts § 633 cmt. h[7]; see also Prosser & Keeton on Torts § 128, at 972-73; Amerinet, 972 F.2d at 1503-04 (noting that, where a plaintiff is unable to show loss of specific sales, "'the modern view allows plaintiff to prove a general

---

[7]Restatement 633 provides that the asserted pecuniary loss must "result[] directly and immediately from the effect of the conduct of third persons" and that such loss "may be established by

> (a) proof of the conduct of specific persons, or
> (b) proof that the loss has resulted from the conduct of a number of persons whom it is impossible to identify.

The pecuniary loss thus must be caused by the impact of the challenged statements on the conduct of third parties, who may be identifiable ((2)(a)) or not ((2)(b)).

decline of business, so long as this is shown to be the result of defendant's disparaging statements and other possible causes are eliminated'" (quoting Advanced Training Sys., Inc. v. Caswell Equip. Co., 352 N.W.2d 1, 7 (Minn. 1984))); Fashion Boutique v. Fendi USA, Inc., 75 F. Supp. 2d 235, 240 (S.D.N.Y. 1999), aff'd, 314 F.3d 48 (2d Cir. 2002); Charles Atlas, Ltd. v. Time-Life Books, Inc., 570 F. Supp. 150, 156 (S.D.N.Y. 1983).

The exception is most plainly applicable when disparaging remarks appear in a publication that is distributed to a general audience, leaving the plaintiff unable to identify specific customers who were lost or specific individuals who might have become customers, but did not, because of the negative information communicated by the defendant. The Bose case, which ultimately reached the Supreme Court on another issue, is illustrative. See Bose Corp. v. Consumers Union of U.S., Inc., 529 F. Supp. 357 (D. Mass. 1981), rev'd on other grounds, 692 F.2d 189 (1st Cir. 1982), aff'd, 466 U.S. 485 (1984). The Bose Corporation had alleged that its loudspeaker system was disparaged in an article published in Consumer Reports magazine, which was distributed to "millions of readers." Id. at 363. It was impossible for Bose to identify the customers it had lost, and the district court permitted it to prove damages with evidence showing a decline in the rate of sales

following publication of the article.  Id. at 364[8]; see also Charles Atlas, Ltd. 570 F. Supp. at 156 (involving a product disparagement claim against the publisher of a book that was sold only through mail order).  The more flexible approach to damages also has been applied where the challenged statements were disseminated by means of sales literature.  See Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1338-39 (8th Cir. 1997).

Given Massachusetts' consistent reliance on the Restatement in injurious falsehood cases, see, e.g., Dulgarian v. Stone, 652 N.E.2d 603, 609 (Mass. 1995); Powell v. Stevens, No. 2000-0089, 2004 WL 1047451, at *3 (Mass. Super. May 3, 2004), and the broad acceptance of the product disparagement cause of action as discussed in the treatises, a federal court applying Massachusetts law must assume that the state's courts would follow the Restatement's approach to the special damages rule and the widespread dissemination exception.  Thus, a plaintiff asserting product disparagement in Massachusetts must show that the challenged statements caused it to lose the sales of specific customers unless wide dissemination of the statements makes it unreasonably difficult for the plaintiff to prove its damages by identifying particular losses.

---

[8]The district court in Bose did not invoke the "widespread dissemination" exception by name, but used its approach in allowing Bose to prove a decline in sales from publication of the article. See 529 F. Supp. at 364.

## II.

### A. VSI's Claim to the Widespread Dissemination Exception

VSI asserts entitlement to the widespread dissemination exception because the challenged statements were communicated through MPT's twenty-five sales agents and key executives to many potential customers who would be impossible to identify. In response, MPT emphasizes that this case does not involve a general-circulation publication, and it argues that the limited universe of customers potentially affected by its statements renders the widespread dissemination exception inapplicable.[9]

MPT is correct that the circumstances here differ in a significant way from those typically associated with the widespread dissemination exception. MPT's twenty-five sales agents presumably know which customers they visited during the relevant time period. In addition, VSI claims that MPT's aggressive marketing wrested away some of its existing customers in addition to discouraging new purchases, and it would therefore seem feasible for VSI to have contacted the customers it lost during that period to inquire

_____

[9]It alternatively claims that VSI has not proven wide dissemination because the record shows only a single instance in which the challenged statements were actually published to a customer. That contention is unpersuasive. The fact that only one known customer was given physical possession of the marketing bulletin does not mean the statements it contained were not widely disseminated. The marketing bulletin itself urged sales agents to communicate its message "to all health care providers," and it is a fair inference that they followed those instructions and verbally disseminated the bulletin's content, at least generally, to a large group of customers and potential customers.

-24-

whether MPT's statements were a substantial factor in their decision.  See Restatement (Second) of Torts § 632 (stating that publication of an injurious falsehood causes pecuniary loss if "it is a substantial factor in bringing about the loss").

VSI asserts that it is more complicated than it may at first seem to retrieve information from specific customers.  It states that, as a general matter, information about the loss of specific sales to catheterization labs is not reasonably obtainable because "there are myriad individuals at each lab to whom an MPT representative might speak" and "[t]he purchasing decisions are sometimes made by committees."  There appears to be no reason, however, why multiple individuals in the same lab could not be asked about their interactions with MPT's sales agents.  Indeed, VSI's CEO, Howard Root, testified that VSI's representatives "speak to doctors every day.  Anyone who is in the lab using products, we ask them what are they using and why.  We talk to them about what information they have on that product, what they believe about that product, what they like or don't like about the product."  The ability to question specific customers is suggested as well in the testimony of MPT expert Eugene Ericksen, who contacted more than thirty SyvekPatch customers who had switched, at least partially, to the D-Stat Dry.

At the same time, it is apparent that, even if the statements' impact on a number of specific customers should have

been ascertainable, many potential lost sales would have been extremely difficult, if not impossible, to confirm. For example, it would be impractical to expect VSI to contact every one of MPT's longstanding customers in search of those who had considered switching to VSI, but did not do so because of the statements. It would be similarly challenging to determine whether potential customers who ultimately purchased from a competitor other than MPT had excluded VSI from contention based on what they heard from MPT's sales agents.

The circumstances here thus appear to involve a cause of action that embraces both a traditional claim that particular sales were lost and the exceptional claim that many other impossible-to-identify customers were likely affected by the defendant's disparaging statements. If in fact – as VSI claims – virtually no evidence of specific lost sales is accessible, the widespread dissemination exception would seem fully applicable and generalized proof of lost profits could be legally sufficient. If evidence of a number of specific losses should exist and is reasonably obtainable, however, the plaintiff should be required to produce proof of such losses in conjunction with the generalized proof of lost profits. This is so because the proof of specific losses under such circumstances is strong evidence of the causal link between the defendant's statements and the plaintiff's harm, and such specific proof justifies reliance on the generalized proof of

lost profits to establish the dollar value of the loss of market. Moreover, requiring the plaintiff to offer that customer-specific evidence, where it is reasonably available, is consistent with both the traditional strict standard of proof for product disparagement claims and the policy of flexibility underlying the widespread dissemination exception.

The widespread dissemination exception is rooted in principles of fairness, meant to accommodate plaintiffs who lack one-to-one contact with their own customers and are therefore unable to identify individual recipients of the defendant's message. In such instances, evidence of lower-than-anticipated sales based on past performance and market conditions – where "'other possible causes [for the decline] are eliminated,'" Advanced Training Sys., Inc., 352 N.W.2d at 7 – is realistically the only way the plaintiff can prove that the challenged statements caused it to lose customers. Where the record shows that a plaintiff has the means to prove a link between the allegedly defamatory communication and some identifiable set of lost customers, however, the rationale for allowing a plaintiff to rely solely on the general, more speculative evidence of lost sales is considerably weakened.

If the plaintiff shows cause-and-effect between the defendant's statements and the loss of identifiable customers, the jury reasonably can draw the inference that such harm happened more

-27-

widely.  When such exemplar evidence should be available but is not produced – or, put another way, if the plaintiff cannot show that its identifiable customers were influenced by the defendant's statements – the inference of causation becomes unduly speculative. The plaintiff should not be able to satisfy its burden of proof by omitting what is logically the "best evidence" of the harm it alleges.  In effect, that omission renders the plaintiff's proof of causation insufficient as a matter of law.  Cf. Verizon Directories Corp. v. Yellow Book USA, Inc., 309 F. Supp. 2d 401, 408 (E.D.N.Y. 2004) ("Verizon makes no representation that it is in the nature of its business not to have direct contact with its customers. . . . It would be striking if such a large organization would be unable to identify even one customer it had allegedly lost as a result of [the defendant's] commercials."); Fashion Boutique, 75 F. Supp. 2d at 240 (rejecting applicability of the widespread dissemination exception where the plaintiff store could have interviewed customers from its list of more than 8,000 names to determine why they stopped shopping at the store).

Moreover, in an age of increasingly widespread communication of information, many companies could plausibly claim that disparaging statements about their products were widely disseminated, with the harm extending far beyond the particular customers they can reasonably identify.  If every plaintiff that could show some widespread dissemination were able to avoid the

requirement to prove particular losses, the exception would swallow the traditional special damage rule. On the other hand, the exception would be severely diminished if it were unavailable to a plaintiff whose losses extended far beyond the specific lost customers it could identify.

Applying the widespread dissemination exception to plaintiffs who can identify some, but not all, of the customers who might have reacted to the defendant's disparaging remarks is consistent with the Restatement's description of the exception as applicable to instances where it is "impossible to identify" individuals affected by the disparagement. Restatement (Second) of Torts § 633(2); see also Sack on Defamation § 13.1.4, at 13-22. Impossibility in this context is not an all or nothing proposition. Where the extent of a plaintiff's loss is not fairly reflected in the evidence of specific lost customers because many other customers are "impossible to identify," it is appropriate to allow a plaintiff to prove its damages with generalized evidence of "loss of the market," Restatement (Second) of Torts § 633 cmt. h, so long as the plaintiff also produces the best available evidence of causation. The best evidence of causation, where it is reasonably obtainable, is the proof that specific customers rejected the plaintiff's product because of the defendant's disparaging statements. Certainly, that approach reflects Massachusetts' pragmatic attitude toward proof of damages. See, e.g., Knightsbridge Mktg. Servs.,

Inc. v. Promociones Y Proyectos, S.A., 728 F.2d 572, 575-76 (1st Cir. 1984) (noting in a breach of contract case that "[a]ll that is required" to prove lost profits with reasonable certainty "is a reasonable basis of computation and the best evidence obtainable") (citing Agoos Leather Cos. v. American Foreign Ins. Co., 174 N.E.2d 652, 655 (Mass. 1961)) (emphasis added).

I would therefore construe the Restatement and Massachusetts law to allow reliance on the widespread dissemination exception where widely published statements were also disseminated to customers whose identities are reasonably obtainable. In that circumstance, however, a plaintiff asserting product disparagement must offer evidence that the challenged statements caused the loss of some of these identifiable customers as a prerequisite to claiming damages based on a more generalized showing of lost profits. This approach is in keeping with the "modern tendency" to "requir[e] the plaintiff to be particular only where it is reasonable to expect him to do so." See Prosser & Keeton § 128, at 972.

To apply the widespread dissemination exception as thus construed, the trial court would need to make pretrial determinations on whether evidence of specific customer losses is reasonably obtainable and how much such evidence should be presented in conjunction with the generalized proof of lost profits evidence

that the widespread dissemination exception permits.[10]  That evidence must be sufficient, in the particular circumstances of the case, to permit the jury to find causation.  If the court decides that such evidence of specific customer losses is necessary, it will then be up to the jury to decide if the plaintiff's evidence, including the proof of specific lost sales, shows that the defendant's statements caused all of the plaintiff's claimed losses.

## B. The Missing Evidence of Specific Lost Sales

VSI presented no evidence of any specific lost sales resulting from MPT's statements.  It argues that circumstantial evidence of specific lost customers <u>was</u> presented to the jury, however, through MPT's witnesses, who testified about meeting with a number of identified customers and persuading some of them to change their accounts from VSI to MPT.  None of this "specific" evidence links MPT's statements to VSI's loss of any customers.  VSI cites the testimony of MPT's marketing director, Peter Stevens, that MPT regained business from a hospital in Virginia (Crailion) that had been using the D-Stat Dry after he met with a cardiologist there.  Stevens' testimony, however, focused on his efforts to persuade the doctor that the SyvekPatch had a clinical basis.

---

[10]These determinations must be made pretrial because the nature of the evidence that will be required at trial depends on whether the widespread dissemination exception applies, and to what extent. This requirement is not an innovation.  The availability of the exception would always have to be determined pretrial because of its effect on the damages proof at trial.

Indeed, VSI presumably could have inquired of the same cardiologist and his colleagues at Crailion about their exposure to the statements in the marketing bulletin.

VSI also points to MPT's damages chart, claiming that it "shows multiple customers that MPT lost and then regained, presumably after its sales force or top executives spread 'the message.'"[11]  Although the record might support an inference that, along with touting the SyvekPatch's scientific value, Stevens communicated false statements about the risks associated with the D-Stat Dry, the chart is not equivalent to evidence showing that a particular customer was swayed by one or more of the five challenged statements.  It does not contain examples of customers whose rejection of the D-Stat Dry is explicitly linked to MPT's disparagement or even circumstantially attributable to the statements.  The chart contains no information indicating why the listed customers switched from one company to the other, and then back again.  It is this kind of customer-specific evidence, describing how the disparaging statements at issue affected them, that would support a finding that many other customers were similarly affected. Without this customer-specific evidence, a jury finding that the customers reacquired by MPT returned as a result of the challenged statements, rather than for some other reason –

_____

[11]The chart, which shows sales totals in dollars for numerous MPT customers for the years 2002 through 2007, is labeled "MPT Accounts lost as a Result of Vascular Solutions Activities."

perhaps that the D-Stat Dry did not meet their expectations – would rely on the same kind of speculative inference that must be rejected as insufficient to prove lost profits where evidence concerning specific lost sales is reasonably obtainable.

Notably, Stevens described a number of specific instances in 2004 in which he was unable to persuade lab representatives with whom he met to continue or resume using the SyvekPatch. He testified to visiting "well over 100 cath labs" in 2004, seeking to discover the reason for MPT's sales losses and to convert customers back to the SyvekPatch. On cross-examination, he confirmed that, in "the majority of cases," MPT lost the accounts despite his efforts – evidence that weakens the inference that statements from MPT executives were persuading customers to reject or abandon the D-Stat Dry as too risky.[12]

The record thus contains no evidence linking MPT's statements to particular behavior by VSI customers. Indeed, in deposition testimony, VSI's former vice president for sales, Michael Nagel, stated that he was not aware of the loss of any customers or sales on account of MPT's statements. Although VSI asserts that its CEO, Howard Root, rather than Nagel, would have received reports of lost accounts that appeared to result from product disparagement,

_____

[12]Although not all of the customers Stevens visited had switched to the D-Stat Dry, VSI acknowledges that at least some of those customers were among its clientele, and that group included some who remained VSI customers despite Stevens' efforts to woo them back.

Root also provided no specific examples. VSI apparently did not lose the only customer who is known to have received a copy of the marketing bulletin containing the five statements.

In responding to interrogatories, VSI named nine hospitals where it claimed to have lost sales because of MPT's sales tactics. That information was not introduced at trial. The absence of evidence concerning specific customers is particularly troubling given that VSI's generalized evidence of damages was unimpressive – a weakness that has prompted the majority's remittitur approach and the proposal of a reduced award.

## C. The Waivers and the Remedy

Despite the deficiency in VSI's proof of damages, MPT did not argue in the district court that VSI's product disparagement claim was deficient as a matter of law solely based on VSI's failure to prove particular customer losses.[13] In its motion for judgment as a matter of law at the close of the plaintiff's case, MPT argued more generally that VSI's claimed damages were "too speculative to be recoverable as a matter of law." Even in its post-trial motion for judgment as a matter of law or new trial, MPT argued that the damages award was legally unsupported only because "the law in Massachusetts is that a plaintiff may not establish lost profits

_____

[13]MPT did object to VSI's mid-trial change in its damages theory from asserting lost sales at the nine specifically identified hospitals identified in discovery to claiming a loss of market share, but it did not raise the requirements of the product disparagement cause of action as a basis for its objection.

simply by showing that it missed projections, which is the only evidence of causation VSI offered." In its supporting memorandum, MPT further argued lack of causation by pointing to the absence of particularized evidence, asserting that VSI had failed to show "that any customer ever even heard MPT's allegedly false statements, much less made a purchasing decision based on them" and that a lost profits claim could not be based solely on "a discrepancy between the plaintiff's sales projections and its actual sales." The memorandum did not, however, address the widespread dissemination exception, which VSI invoked in its response.

In my view, both parties bear responsibility for the gap in the record on damages. VSI should not have presumed that it would be deemed entitled to the widespread dissemination exception, given the traditional grounding of product disparagement claims in proof of specific customer losses. Arguably, VSI should have produced evidence of specific customer losses, or established that such evidence was not reasonably obtainable, to avoid forfeiting its claim. See Prosser & Keeton § 128, at 972-73 ("It is probably still the law everywhere that [the plaintiff] must either offer the names of those who have failed to purchase or explain why it is impossible for him to do so . . . ."). For its part, MPT failed to object when VSI changed its damages strategy mid-trial on the ground that the traditional special damage rule for product disparagement actions requires a showing of specific lost customers. MPT's failure to

argue that particularized proof of loss was required as a matter of law arguably forecloses reliance on that contention on appeal. Yet, oddly, VSI has not argued that MPT waived this issue.

Given the unusual circumstances and the substantial $4.5 million award, I believe the most appropriate outcome is to remand the damages issue for further consideration by the district court. I do not see the problem as inadequate evidentiary support for the amount of damages; rather, I believe a preliminary issue must be resolved before <u>any</u> damages may be awarded. In my view, the district court must decide the threshold question of whether VSI is entitled to rely on the widespread dissemination exception – i.e., whether evidence of specific lost sales was reasonably obtainable by VSI. If the district court were to find that specific lost sales would be unreasonably difficult for VSI to identify, it could appropriately reinstate the damages award without further proceedings. If, however, the court concluded that evidence of specific customer impact was reasonably accessible, the most appropriate next step would appear to be a new trial on damages in which VSI could attempt to make the required showing.[14]

I would therefore vacate the judgment in favor of VSI and remand for such further proceedings.

---

[14]In that case, the district court also would need to decide how much specific lost-customer evidence must be presented in conjunction with generalized evidence of lost sales.